EMILIO ANTONIO MELÉNDEZ, Plaintiff and Appellee, *v.* EMILIO CIVIDANES, Defendant and Appellant.

No. 8734. Argued November 29, 1943.—Decided February 1, 1944.

*Dubón & Ochoteco* and *Otero Suro & Otero Suro* for appellant.
*Carlos D. Vázquez* for appellee.

Mr. Justice De Jesús delivered the opinion of the court.

This is an appeal taken from a judgment declaring Antonio Meléndez an acknowledged natural child of the appellant and adjudging the latter to pay the costs and $150 as attorney's fees. The appeal is grounded on the insufficiency of the evidence to support the judgment and on that the plea of *res judicata* should have prevailed.

1. The evidence is conflicting. That for the plaintiff may be set forth as follows: About the year 1923, María Meléndez, a girl sixteen years of age, was working as a cashier in "La Mallorquina," a restaurant in this city. Facing this restaurant, there was a shoe store where Emilio Cividanes, then about forty years old, used to work. Cividanes, who frequently dropped in "La Mallorquina," made love to her. By May 1923, they were already engaged and went out together to the movies, to the park and to other public places. On the following August he invited her to meet his family at his house on 59 Luna Street. She consented, but on reaching the house she found that the only person there was Cividanes. Taking advantage of the fact

that they were alone, he seduced her under promise of marriage. Two or three days later he leased a room from Joaquín Rodríguez on 40 Sol Street, where they lived as husband and wife. After the girl became pregnant, she realized that Cividanes was trying to desert their home, and was carrying away his clothes. When she discovered her lover's plans, she went to see the District Attorney at San Juan, and the latter not being then at his office, she informed his stenographer, Mr. Jesús Díaz Paradizo, about her seduction. Cividanes was summoned to appear before the district attorney, and when he came pursuant to the summons, he met María there. Díaz Paradizo told Cividanes of the charge against him and that María claimed she was pregnant. Without admitting or denying the charge, Cividanes led María to the waiting room at the district attorney's office, and there he promised to take care of her and of the baby at its birth if she withdrew her complaint. She accepted his promise and they both returned to the room where Díaz Paradizo had stayed and informed him of their agreement and that she had made up her mind to withdraw the complaint. Thereafter they lived together. Two or three months before the baby was born, Cividanes went with María to see a nurse and midwife, named Luisa Sierra, who examined the former and agreed to attend her at the delivery of the child. At about the same date, Cividanes himself asked Herminia Fuentes to prepare a layette for the infant, and he paid for it. They moved from 40 Sol Street to another room on 98 Luna Street which he leased from policeman Carmelo Meléndez. While living at the latter place, he sailed for the United States, giving her $50 from which she should pay $30 for rental and $20 to meet her personal expenses. In addition thereto, he gave Joaquín Rodríguez $20 to pay for the services of the midwife. As childbirth approached, María entered the Maternity Hospital, where plaintiff was born on June 30, 1924. At that time, after having stayed

away for a month, Cividanes returned from the United States. The child's eyes and navel became infected and Cividanes called Luisa Sierra again, who cured the child and received $40 for her services. Since policeman Meléndez had to move in order to have his house repaired, Cividanes and María leased a room in the house of the widow of Cordero, at 6 San José Street, and some time later moved to Pablo Pollet's house at O'Donnell Street in this city. Cividanes accompanied María and the child to Pollet's house, and they made the lease in his own name. They lived there for some time. In 1925 María brought an action of filiation against Cividanes, a nonsuit judgment being rendered therein. Despite the filing of the suit, they continued to live together until 1926, when Cividanes married his present wife. María has since worked in several places to support herself and her son. When the boy was in the fifth or sixth grade in José Julián Acosta School, the principal of said school, Mrs. Inés Encarnación Santana, dropped in defendant's store to buy a pair of shoes and, on leaving, she told him that his son was in her school and that he was a very good boy, to which the defendant answered that he was glad to hear that, showing the natural gratification of a father whose son is praised. Later on, during the same school year, when celebrating a Tribute to the Old, plaintiff carried a letter which the Principal sent to Cividanes asking for his contribution. In the letter she referred to plaintiff as his son. The letter was delivered to defendant, who willingly contributed with a pair of slippers. The plaintiff further testified that on diverse occasions he had called on his father at the store, that the latter received him affectionately, and kissed and introduced him to others as his son. It seems advisable to add that all the persons above mentioned testified as witnesses for the plaintiff and each of them sustained what had been asserted about them. All the witnesses, except Díaz Paradizo, testified

as to acts of the defendant tending to establish the status of natural child in which defendant held the plaintiff.

The evidence for the defendant consisted of his own testimony and that of María. She was called to the witness-stand in order to identify a letter signed by her which apparently tended to discredit her testimony. She was also examined in connection with the previous suit of filiation, Civil Action No. 3543, to which we shall refer presently when discussing the plea of *res judicata*.

The defendant did not deny having met María while she worked at "La Mallorquina" and expressly admitted having had sexual intercourse with her and having accompanied her to the movies. He also admitted having been summoned to the district attorney's office and that he had promised to help María and the baby; that he helped her, but did so indirectly through other persons so as not to furnish evidence against him. However, he testified that they had never lived as husband and wife; that plaintiff was not his son and that, contrary to what all the witnesses, except Díaz Paradizo, had testified, he had never shown any affection for the child. Finally, he testified that he helped María and her son simply as an act of charity and to avoid trouble. In support of his testimony, he offered in evidence the following letter, signed by María Meléndez and which was a part of the record of the former suit:

"My friend Emilio:

"Let me ask you a favor. Due to what has happened to me, my family does not want me at home and I find myself alone in this world. If you were good enough to lend me some money or pay a room for me until the arrival of the child. I will repay you as soon as I work. The father of my unborn child deserted me. Since you are the only friend to whom I can resort in my misfortune, I beg you to help me in whatever way you can until the child is born. If the child's father sends me some money, I will repay you immediately or else I will do it when I get a job. Please do it and may God bless you. Do not fail to help an unfortunate girl

destitute of family. You are the only friend who can help me. I am not asking too much. Please get a room for me, if you .can. Otherwise, I shall commit suicide. My child's father is in Santo Domingo. He has not sent me a' penny for my support. Have pity on me, and help me. Some day I will repay you.

Your friend, María.

I shall either drop in or call you up to get your answer.''

María Meléndez admitted having written the letter, but she claimed that said letter was dictated by defendant, who told her that if she refused to write it he would help her no more; that on her refusal defendant took out a revolver, and told her that if she did not write what he was going to dictate, he would shoot himself, and on account of that threat she wrote it. However, she denied the truth of the contents of the letter, and asserted that the defendant was the only man with whom she had had a love affair. Defendant himself testified that María was "a good girl," that she was very much in love with him; and admitted that he had required this letter from her, on the advice of his friend Attorney Enrique Rincón Plumey, who had told him that with such evidence at his disposal he would be protected from any action that María might bring against him.

In support of his plea of *res judicata,* defendant introduced in evidence the original and amended complaint and the answer, as well as the judgment on the former suit. The action of filiation was brought by "Marcos Meléndez, in representation of his minor child María Meléndez Acosta" and filed under No. 3543 of the civil cases, in the District Court of San Juan, First District. On October 29, 1924, Manuel Moraza, as attorney for plaintiff, filed the original complaint.

When the pleadings in case No. 3543 were introduced in evidence, the defendant called the attention of the court to. the fifth paragraph of the original and of the amended complaint in which it is alleged that "even though his daughter

María Meléndez has not lived publicly and notoriously in concubinage with the defendant Emilio Cividanes . . . ''

In brief, this is a summary of the evidence introduced at the trial court. We agree with the appellant that certain parts of appellee's evidence are improbable. However, experience shows that in few cases submitted mainly on oral evidence each party adheres strictly to the truth. Ordinarily none of the parties tells the whole truth. Most frequently a witness conceals or alters specific facts and, either mindfully or sometimes unmindfully, he exaggerates them or tries to add a special coloring which always tends to favor the party for whom he is testifying. But that is human nature. For that reason, when the judge is weighing the evidence—a difficult step in judicial process—he is called upon to apply his knowledge of human nature, and with a sound and fair discretion, he must distinguish truth from falsehood; and detach the probable and reasonable, from the improbable and doubtfull, without overlooking the surrounding circumstances. Once the truth is determined by accepting what may be true of each party's theory it will be an easy task to weigh the evidence.

Rarely do we find an action of filiation where the alleged father is not shown as anxious to tell everyone he meets that he is the father of the child alleged to be his son, that he loves him dearly, that he will look after his education, and sometimes, as in the instant case, he is described as bathing the child and changing his diapers in front of outsiders, in order to prove acts of paternity. But in the case at bar we have no doubt that the defendant made love to plaintiff's mother, that she consented to her seduction under his false promises, that they lived in concubinage in different houses in this city, that as a result of their love affair the plaintiff was born, and finally that at the time of the latter's conception his parents were unmarried and could have validly married.

The letter admitted in evidence does not contradict the evidence for the plaintiff. We know its source and the reason which motivated it and that is sufficient to discredit it.

■ Lastly, the admission contained in the original and amended complaint in Case No. 3543, does not contradict the testimony of María Meléndez and her witnesses regarding the concubinage. In addition to the fact that said suit was filed by Marcos Meléndez, the father with *patria potestas* over María Meléndez, said complaints were neither signed nor verified by María Meléndez and neither did she furnish Attorney Moraza the facts set forth in either complaint. Wigmore on Evidence, 3d ed., § 1066; 3 Jones on Evidence, 4th ed., § 272, p. 511.

2. Let us now consider the plea of *res judicata.*

■ The plea of *res judicata* arises from the necessity of putting an end to litigation. Hence, in order to invoke that doctrine successfully, a substantial identity between the sub-ject matters, the causes of action, the parties and the capacity in which they acted, as well as the fact that the former adjudication was on the merits, must be established. To this effect Manresa says:

"Moreover, the judgment should be final, barring by its nature and that of the trial in which the same was rendered, a second action on the same subject matter, for in this case the doctrine laid down in the judgment of June 14, 1884 and May 6, 1886 would have no application . . . " 8 Manresa (2d ed. 1907, p. 583).

■■ The judgment in the former suit invoked by the defendant was rendered, as we have said, on a motion for nonsuit, and, as we shall see, it is a judgment that by its nature does not bar a subsequent action between the same parties or their privies on the same subject matter. This is so because the motion for nonsuit partakes of the nature of a demurrer to the evidence introduced by the plaintiff. The judgment of nonsuit decides only that, admitting as true the evidence introduced by the plaintiff, it is insufficient to

prove the cause of action. It is not a judgment on the merits. Therefore, the plaintiff is not barred from obtaining a judgment in his favor if, after a judgment of monsuit has been rendered, a new action is brought, within the statutory term, and the evidence then introduced proves the allegations. It may happen that upon a denial of a motion for nonsuit, the defendant rests his case on the merits of the evidence introduced by the plaintiff, and the court, upon weighing such evidence, renders judgment for the defendant on the merits. *Haldeman* v. *U. S.*, 91 U. S. 584, 23 L. ed. 433; *Biurrum* v. *Elizalde* (Cal., D. C. A., 1925), 242 P. 109, 113; Restatement of the Law of Judgments, § 53, p. 207.

There is an exception to the rule above noted, to wit: where it affirmatively appears from the evidence introduced by the plaintiff that, as a matter of law, he is not entitled to a judgment in his favor, the judgment of nonsuit ends the litigation definitively and operates as a judgment on the merits. *Bartell* v. *Johnson* (Cal., D. C. A., 1943) 140 P. (2d) 878, and cases therein cited. But the evidence which had been introduced in the former suit, was not offered in the second suit, so as to enable the court to determine whether the plaintiff was entitled to a judgment in his favor. The defendant, who alleges the plea of *res judicata,* was bound to introduce said evidence; and his failure to do so cannot prejudice the rights of the plaintiff.

In addition to the nature of the judgment of nonsuit, which as we have seen, operates as a bar to the plea of *res judicata,* §§ 192 and 193 of the Code of Civil Procedure provide that a judgment of nonsuit is not a judgment on the merits. To this effect, see the case of *Rincón Water & Power Co.* v. *Anaheim Union Water Co.*, 115 Fed. 543, construing the provisions of the California Code of Civil Procedure, similar to §§ 192 and 193 of our Code.

The appellant cites Rule 41 (*b*) of the Rules of Civil Procedure, which provides that a dismissal under this sub-

division and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, operates as an adjudication on the merits. But Rule 86 provides that these rules will take effect on September 1, 1943, and that "They govern all proceedings in actions brought *after* they take effect and also all further proceedings in actions then pending . . . ." But as the judgment in the former suit was rendered on March 11, 1925, it is obvious that said Rule of Civil Procedure is inapposite.

Since the evidence introduced is sufficient and the plea of *res judicata* raised by the defendant does not lie, the judgment will be affirmed.